May it please the Court, Mark Drozdowski from the Office of the Federal Public Defender for Petitioner and Appellant John Visciotti. Visciotti's right to a public trial was violated when the judge held all six and a half days at Beth Poundly voir dire privately in chambers with just counsel and the examined juror present. The clearly established federal law for this claim is Press, Enterprise and Waller, two 1984 U.S. Supreme Court cases decided before the California Supreme Court denied the claim on appeal. Was that law clearly established at the time of this voir dire? Yes, it was. And I acknowledge Press, Enterprise is a First Amendment case. Waller is a Sixth Amendment case. Was Press, Enterprise decided before the trial? It was decided after the trial. Before the appeal. During the appeal. So the answer is it wasn't clearly established at the time of the trial, but it was during the appeal. No, Your Honor, respectfully, the answer is that under the U.S. Supreme Court's Green case, it's clearly established because the question of whether a law is clearly established is whether it exists by the time I know. That's what I was saying. I apologize. And another case that's very clarifying on this and makes the point is the Presley case from the United States Supreme Court. Presley is a 2010 case, but it says that the Sixth Amendment right to a public trial at voir dire is so clearly established that it could decide that case on summary disposition, that it was so clear back in 1984 that you had a public trial right at voir dire. So Presley makes that point as well, and we cite that case in the briefs. So it seems to me your problems with regard to this issue are primarily along the lines of procedural default and prejudice. So I would like you to address that. Those. Those. Yes, Your Honor. With regard to procedural bar, I would say this. As a matter of federal constitutional law, there's not a requirement to object to maintain the right. And Waller makes that point because in Waller, five defendants said that their right to a public trial was violated at a suppression hearing. And the Supreme Court noted that one of the five defendants, Cole, had actually agreed with the prosecutor that the suppression hearing would be closed, should be closed. Yet the Supreme Court entertained Cole's claim in the U.S. Supreme Court. Now, the court did say that on remand, because it was remanding the case to the Georgia state courts, that the Georgia courts could consider whether, as a matter of State law, the failure to object may preclude review of the claim. But you're saying substantively, as a matter of federal constitutional law, the objection is not embedded into the substantive protection. That's exactly right. That's what I'm trying to say. That's a different question. And now, whether as a matter of State law, a procedural bar can preclude review. But there are a bunch of hurdles the State has to make to make that a procedural default that would be binding in this case. And the start of all that is that the Attorney General, in their answer in this case back in 1998 and 1999, said that the California Supreme Court denial here was on the merits. They did not raise any procedural bar objection. In other parts of their answer, they raised procedural bar defenses to a host of other claims. But they did not to this one. So you're saying it wasn't defaulted, in fact, by the State courts? Well, the California Supreme Court opinion is very interesting. And when we look at it, I think there's a number of ways to evaluate it. It's at excerpts of record 35 and 36. It's got a heading F, exclusion of public and the press. And it says, it notes that the defense counsel failed to object. And it also says that because the sequestered voir dire is for the benefit of the defendant, it is doubtful that any competent defense counsel would have objected to it. Now, there's a number of ways of looking at that opinion. And, but I would, I would say that no matter how the court looks at it, I think we end up at the same place, which is de novo review. The court could conclude that that opinion is based solely on a failure to object. As I've, as I've said, as a matter, matter of Federal constitutional But then, even if, you don't get to de novo review until you deal with a procedural default problem, if there is one. In other words, you can't have it both ways. If they had decided on the merits, it's because they thought there was no objection, so you have a procedural default problem. If they did decide on the merits, then you, you don't, then it's not de novo, right? We, I understand. It's this. If they deny it solely on a procedural ground under Cohen v. Bell, that's review de novo. However, if the Attorney General But I'll make you get by the procedural default, which is what I'm asking you. Exactly. No, I agree with you. I'm sorry. I'm not fighting you on this point. Right. No, then we might have a procedural default problem theoretically. In this case, we don't, because the Attorney General never timely raised it in district court. Their answer never raised a procedural default defense to this claim. And Judge Reel, in October of 1999, when he granted relief on the ineffective assistance of penalty claim, and he denied relief on the guilt-based claims, and then he looked at another group of claims and said, these go to penalty only and these are moot, so I'm not adjudicating that. Now, when he did this, in one of his orders, right on the first page, in a footnote, he says, the Attorney General has never asked for a ruling on any of their procedural default claims, and I'm reaching the merits of these claims. Now, I want to emphasize again, the Attorney General never raised a procedural default. Did Judge Reel reach the merits of the closed voir dire claim? No, he did not. On this claim, he said it was moot, and so he didn't. So I'm making the general point, but Your Honor's absolutely right, he didn't. Had he granted the penalty phase, but had he granted the guilt phase also? No. He denied relief on the guilt phase. So it wasn't moot. Excuse me? So it was not, in fact, moot. The other penalty claims, the other claims that went solely to penalty relief I understand, but the voir dire didn't. So, in fact, if he didn't raise it, if he didn't decide it, that was a mistake. No. The voir dire claim does go to penalty relief. But not only to penalty relief. It goes to both, doesn't it? It could. I think the most correct analogy is to the cases under the Witherspoon and Witt line of cases, where the claim is that a juror was wrongly removed for cause during death penalty voir dire, and the relief in that case is a new penalty trial with a new This was a closed, are you arguing, are you telling us now that the closed courtroom claim only deals with the penalty phase? I'm saying that It covered the entire case. It could cover the entire case. Now, let me ask a question this way. Are you only asking for relief from the death penalty on the voir dire claim? In other words, suppose your theory is correct. You know, one, that you had the right at the time. You didn't waive it. Procedure of default wasn't raised. So you should win on the you should win on the Sixth Amendment claim, right, to public trial. So if you win, all you want is a new penalty trial. Is that what you're saying? No, I'm saying that I understand that the court could say that you also get guilt relief. I'm asking what you're what you're asking for. Right. Under your theory, doesn't it go to the entire case? Now, in other words, the guilt phase as well as the penalty phase, the voir dire claim, I mean. I think it could go to both. What I'm trying. What it could do, it does. Under your theory, it does go to both, doesn't it? Well, the same jurors sat at the guilt and penalty phase. I mean, that is certainly true. And they sat through the entire trial. And there's a lot of literature out there about how once a juror is death qualified, that that makes them more prone to find guilt. So I certainly understand all that. What I'm trying to what I'm trying to say is what you understand is what you're asking for. You see, you know, I think going back to what Judge Brisson says, you know, in some ways you're trying to have it both ways. No, no, no, Your Honor. Respectfully, we're not trying to have it both ways. The judge real when he denied the claim, he characterized it as a penalty phase claim. He said, I'm not I'm talking about in 1999. He says, I'm not reaching this claim under the theory that it's a penalty claim. And he was just wrong about that. But it doesn't matter now. Right. I mean, it basically doesn't matter. He's now reached it. He's now reached it. He he denied it under 2254 D, applying 2254 D to it. He did not find it procedurally barred. And he was wrong to conclude the 2254 D barred relief. Because, as I said, did you say D one or D two? No. Let me find the opinion. I think it was D two, wasn't it? It's at excerpts of record 307 and 308. He covers both his last sentence at the end of page 307 and over to 308, says the state court's ruling denying this claim was neither contrary to nor an objectively unreasonable application of federal law that was firmly established at the time, and the ruling was not an objectively unreasonable determination of the facts in light of the state court records. So that covers both provisions, D one and D two. And again, that's at excerpts of record 307 and 308. As I mentioned, one way to view the state court's denial is it's solely based on the failure to object, and therefore we get de novo review. But another way to look at it as well is that it never adjudicated the federal basis of the claim. And I say that because when Vichotti raised the claim in his supplemental brief on direct appeal, he cited Waller and Press Enterprise, and he asserted his Sixth Amendment right to an open trial. And the California Supreme Court opinion never addresses those cases. It never discusses the Sixth Amendment right to trial. It basically bases its decision on the Hovey case, which allowed for sequestered voir dire, and which was made under the California Supreme Court's supervisory authority, not based on federal constitutional law. And was also based on a case, People v. Thompson, and when you look at People v. Thompson to the pinpoint site in footnote seven of that opinion, it says, the defendant has a right to a public trial based on the state constitution and state statute. It doesn't mention a federal constitutional violation. So under- But we, it is true, as far as I can tell, that the state has never claimed a procedural default here. Correct. But does that mean that we have to view what the state court decided as substantive? I mean, I gather you're, I think what you're saying, but I'm not sure, is that they've waived the default, but that doesn't mean that we have to read the state court decision as having been on the merits. Correct. Because we can decipher ourselves whether it was on the merits or not. That's correct, whether it was, yes, whether it was on the merits or not. And the state can still waive the default and we could still not have to deal with cause and prejudice. Is that, I mean, is that sort of how you can get both pieces in? No, that's right, that's right. And I'll just say the, right, right. When a state court denies a claim solely on a procedural bar, as long as that default doesn't hold up in federal court to preclude review, you now have de novo review of that claim. And 2254-D does not apply. Basically, you're saying you don't have a default, but you also don't have a merits decision. I think that's one way of looking at the decision, and I think that's right. There is a bit at the end where the court says, the California Supreme Court says no reasonable defense lawyer essentially would object in this situation because sequestered death penalty voir dire benefits to the defendant. And that doesn't even get to the question in this case about closing the courtroom to all comers. It doesn't really answer the claim here. It's a non sequitur. It also, the state argues that the California Supreme Court opinion complies with Waller and Press Enterprise, but it doesn't. It doesn't even discuss those cases. It doesn't say that the findings were made to withstand review. It doesn't say that the trial court considered less restrictive alternatives on his own, which is a requirement and pressly granted relief on that sole ground that the trial judge failed on his own to consider less restrictive alternatives, even if they aren't offered by the party. So even if the court concludes that there is a merits ruling on the federal claim by the California Supreme Court here, it's contrary to an unreasonable application of federal law for the reasons I've said. And also the extent that it requires an objection from defense counsel to preserve the claim. As we've discussed, that's just not a federal constitutional requirement. But the cause and prejudice analysis is made under state law, isn't it? Cause and prejudice is a federal question. I know that, but it's made by reference to state law, what state law requires. Correct. Correct. If the attorney. So when you say, you know, there's no constitutional requirement, that's a non sequitur, isn't it? Well, it's, no, what I'm trying to say is that it's not a federal constitutional requirement, but the cases do acknowledge that you could have the state procedural bar in this instance. As I say here, I think the State has waived this a long time ago. As I understand what you're saying, you're saying that the federal protection is not defined as closing the courtroom in the face of an objection. That's not, it's closing the courtroom. Correct. As a federal matter. That doesn't obliterate any state procedural problem. Is that basically what you're arguing? I'm saying that the federal constitutional claim exists even if the defense lawyer does not object. I mean, we've cited a 2004 Seventh Circuit case, Walton, that talks about this claim can only be waived by a knowing, intelligent, voluntary waiver on the record. And if you don't have that, the claim keeps going. I think that's the right rule. I acknowledge there are cases saying you can have state procedural default and that that, in some cases, may preclude review of the claim. That is not this case because the Attorney General never raised a default at the time below. I saw that the Attorney General brought it up in 2006 when Mr. Bishotti filed a Second Amendment petition. That's not an interpretation before us. No. So it doesn't really matter what happened before. I will also say if the Court were to find somehow that there is a bar here and somehow the Attorney General timely raised the claim and showed under Bennet v. Mueller that it was adequate and independent at the time of the default, we could still show cause and prejudice by ineffective assistance of trial counsel. And we've cited cases in our brief saying that in that situation, if the Court is not inclined on the current record to find deficient performance by trial counsel for cause, we should get a remand for that. And we've cited a case, Withers, in our briefs for that point. But we shouldn't even get there because this defense has long since waived. I wanted to briefly go to our other claim, unless there's more questions about the public trial claim. And that's a claim of ineffective assistance of counsel at penalty. It's our Claim 1C. And the key issue there is that Kathy Cusack was allowed to testify to Bishotti stabbing her after she told him she was pregnant. Before you get to that key issue, isn't there another key issue, namely whether or not this claim has already been decided by the U.S. Supreme Court? That is an issue, Judge Tashima, and our answer is that it has not been decided and this Court is allowed to consider that issue. It may have been decided inappropriately and summarily and so on, but there's a sentence in the Supreme Court opinion saying you can't have any habeas corpus on 2254D on this claim, right? I mean, I don't know why, but there it is. Your Honor is correct. The opinion concludes with saying that relief is unavailable and it says 2254D, but that's in the context of an opinion that is all about the D1 claims that the Attorney General raised. I know that recently in Williams we had pretty much exactly the same situation with an overbroad statement in a Supreme Court case that for my money couldn't have meant what it said, but it said it. And the panel with a fair amount of disgruntlement and muttering said we don't have any choice on remand. No, I understand that case. I think there's a petition for rehearing on it, if I remember correctly. It's not over yet. I understand the opinions Your Honor is discussing. And then, you know, the panel members were not, were somewhat caustic about the whole thing, but they thought the hearings were time. So the question for you then here is how do you distinguish your 1C claim from Williams, right? Well, we're okay because we're talking about Williams, but there's also other cases where the U.S. Supreme Court has said relief is not available under D1 and it does allow a remand. But that's not what it said. That's your problem. In this case it says not available under D. It does, but that's, but the entire opinion is about the D1 claims that the Attorney General made. Well, what are you saying? It was just a slip of the tongue of the Supreme Court? They didn't mean what they said? When we look at Supreme Court law and this circuit's law about what a court, a lower court can decide on remand, you look into whether the issue was addressed or whether it was explicitly or implicitly decided. And the issue of Kathy Cusack's testimony coming in solely because of defense counsel's blunder and then that being wrongly considered in re-weighing aggravation and mitigation was not something the Supreme Court addressed. It wasn't before it. And the fact that they say they add the ---- What do you mean it wasn't before it? I mean, if it wasn't before it, that was sort of a, I mean, it was, I guess it arises in the case in two different ways. It's sort of embedded in the basic penalty phase in effectiveness claim. And then you have a separate claim. And then you also have a cumulative error claim in which it would be embedded. Right? Correct. So are you now saying, well, it was decided in the first way, but not the second and third ways, essentially? What I'm trying to say is that Vashadi 1, the Attorney General, takes a cert petition that has two cert questions that are both D1 questions. They're challenging. But you've covered this in your brief. We have, Your Honor. You probably want to save a little time for rebuttal. I appreciate that. And I will do that. I will save the balance of my time for rebuttal. Thank you. Thank you. May it please the Court, Meagan Beale, Deputy Attorney General, on behalf of Respondent. Your Honors, the United States Supreme Court has already decided the issue of prejudice due to the ineffective assistance of counsel at the penalty phase. Prejudice is a mixed question of fact and law and must necessarily be decided    It's a mixed question of fact and law. under both D1 and D2, as the Court noted. But they didn't notice at all this problem about, I mean, maybe because they were operating summarily, but they didn't operate at all, they didn't notice at all that the evidence that they were relying on had come in in at least a somewhat peculiar fashion and that there was an argument, and I don't know whether it was made to them or not because those were pretty excellent things, that the evidence was the result itself of ineffective counsel. It was never, Vashadi never raised this issue until after Vashadi lost at the Supreme Court in 2002. And so Vashadi has never raised this issue until after he lost in 2002 and then he came up with this creative other additional issue to try and prolong this matter. But it is an issue. I have not looked back on it. But it wasn't said in the briefs before us the first time around that we should disregard this evidence because it wasn't, you know, it was just part of the ineffectiveness. It was not raised before this Court in 2002? As a separate issue. But it wasn't part of the discussion as to the prejudice question? No, it was not. And this Court, when this Court discussed prejudice, this Court discussed all of the matters, including the CUSAC testimony coming in as a result of the inefficiency. And this Court found that the aggravating factors did not outweigh the mitigating factors. And that's at page 118 of this Court's prior opinion, that the aggravating factors, including the CUSAC evidence, were not sufficient to outweigh the mitigating factors. So this Court, this issue was never raised at any point before this. And for good reason, because the CUSAC evidence would have come in, in any event, in rebuttal. The ruling of the trial court was that CUSAC could not testify at the penalty phase in the prosecution's closed case in chief. But the presentation of rebuttal evidence was very broad in California at the time. And once Vachotti put on any mitigating evidence that sought to lower his moral culpability for this crime, then CUSAC's testimony would come in as a witness. In addition, of course, it was already in testimony at the guilt phase that the testimony was that Vachotti had lied about a woman, CUSAC, being there and being stabbed. And the photographs of CUSAC with her seven stab wounds were presented at the guilt phase. So it was clear that Vachotti had lied. And I'm not sure that the court has decided the merits of nor has the Supreme Court of the guilt phase in effecting this claim, right? No, Your Honor. We decided the prejudice question, but not the merits. The merits meaning whether it was ineffective. Well, this ‑‑ in 2002, this Court of ‑‑ There was no prejudice.  Yes. I think that's correct, Your Honor. All right. So what I'm saying is that it seems ‑‑ one of the things I'm wondering about is whether there isn't a cumulative error claim here, because this whole piece, I mean, it's a real mystery how why anybody would put Vichatti on the stand and have his whole criminal background come out and have him tell an incorrect story about what had happened in 1978 and then open up to that whole set of testimony. So it seemed ‑‑ but that was quite ‑‑ it wasn't ‑‑ we decided that it wasn't prejudicial with respect to the outcome of the guilt phase, but it certainly was pertinent to the outcome of the penalty phase. So then on one level, you would have two pieces of ineffectiveness that led to all this stuff coming in. Well, that's correct, Your Honor. And the California Supreme Court, of course, found that trial counsel was ineffective, and we have not challenged that ‑‑ excuse me, that his performance was deficient, and we have not challenged that finding. And so ‑‑ But what I'm saying is that one of the uncertified issues is a cumulative error issue, and that as such has never been decided, and the Supreme Court certainly didn't decide anything that tied together the two different ways in which this penalty phase. And why wouldn't it be appropriate to grant the COA on that issue? You're going to have a chance to brief that if we want to do it, but just off the ‑‑ and it may have been fair to even ask you. So if you don't want to answer, it's fine. The United States Supreme Court did not have that issue particularly presented to them, although they did have the two cert petitions at the same time. But the California Supreme Court, when the California Supreme Court rules on a constitutional issue raised under state law, it of necessity decides the federal issue as well when the state and federal constitutional law is in sync. And so the California Supreme Court had before it everything. They had before it the entire trial proceedings from the original trial. They had the proceedings from the 12‑day hearing on trial counsel's ineffectiveness at the penalty phase and all the mitigating evidence that should have been put in in this case. And knowing all of that information, the California Supreme Court knew that the CUSAC testimony would come in in penalty phase of necessity because it was certainly true, it was more than relevant to Vachotti's moral culpability in this case, and it was fully admissible under California law. It's a factor B factor, unadjudicated violence. But, I mean, that's another thing. Something that comes in in rebuttal is my understanding is not necessarily available as a case in chief. It didn't come in in the case in chief because it was improper. So how could it be relied upon then as an aggravating factor when the whole ruling in the first place is that it couldn't come in as an aggravating factor because there hadn't been notice. So it can rebut the mitigation, but it can't be an independent aggravating factor. It couldn't come in the case in chief, but it still came in for the truth of the matter asserted, which is it still came in for the truth of CUSAC's testimony that it was Vachotti who was the one who stabbed her so egregiously and continued to stab her after she said that she was pregnant. And in addition, the jury also had before it the fact that Vachotti had lied about this. Now, whether he should have been on the stand or not is one question, but Vachotti was the only one who knew what he did in 1978 and nonetheless lied about the facts of that crime as he lied about the fact that he stabbed Schofield for the purpose of getting back at him for slashing Favello's throat, when Favello's throat was never slashed. And when the evidence showed that instead of going down and catching her. But I'm going to ask you, the more you talk, the more you are demonstrating the ineffectiveness of the lawyer. I mean, the lawyer should have known all this. Well, the lawyer should have known all this. Well, is there any real, you know, I mean, it's so obvious that this lawyer was totally ineffective as far as I'm concerned. What I'm concerned about is how the jury was selected for both the penalty phase and the guilt phase. Yes, Your Honor. And he took these folks into another room in the courthouse, right? Yes. And he questioned them, each one of them. Yes. For what, three days? Yes. And it was closed to the public. Well, there's no evidence of that. No, there's direct evidence of that. There's direct evidence of that. There is direct evidence of that. The court reporter stated in the record who was present. Who was present. But there was no statement that there was anybody who wanted to be there who was not there. And that's what we contend. And all of the Cal, excuse me, all of them. You can't. You're telling me that it's proper for a judge to take jurors into another room and question them himself? Huh? It was proper in California from 1980 until 1990. There's no evidence of that either. That's an egregious violation of the Sixth Amendment. And I've never heard of anyone doing it in California. And I served on the muni court and the superior court. And Cal, excuse me. Now, have you thought about this judge's conduct and the way he conducted this trial and in the way he selected the jurors and what sentiments he expressed throughout the trial? Yes, Your Honor. Yes, Your Honor. Are those sentiments entitled to deference? Yes, Your Honor. Why? Because he was directed by the California Supreme Court to hold the guard ear phase as to the thoughts about death penalty only, excluding the other prospective jurors. I know, but he was not directed. He was not directed to hold it in secret. He was directed to exclude the other jurors. And every court in those, excuse me, in those cases, there's no evidence that anybody wanted to come in. If the press had wanted to come in, perhaps he would have let them in. The chambers? I mean, no one said to close the courtroom. No one was asking him, telling him to close the courtroom. In Covarrubias, that was cited in our brief, that's what the California Supreme Court said in later cases. You can bring the press into chambers. I mean, you can let anybody into chambers you want. There's no evidence that anybody wanted to get in there. The press is welcome. You ever walked into a judge's chambers without the judge's express permission? Out of the hallway? Isn't that the reason? We all know that judges go into chambers because they don't want to be bothered by anybody else. Correct, Your Honor, but there's no evidence that anybody asked to come in. What difference does that make? Well, listen to this. This is what the judge said at the beginning of ordeal, right? He explained that he would, quote, inquire of each prospective juror individually to determine in private with just the court, the two attorneys, and maybe the defendant and the court personnel present. That's what he said, in private, with only those people present. Now, isn't that closing the proceedings when you go back into chambers? You can't walk into a judge's chambers like you'd walk into a courtroom, can you? You could ask to walk in if you need to see that. He said it's going to be in private. You could still ask him if you could come in if you had a reason. There's no evidence of anybody. But the whole point of the public trial is you don't need a reason. You don't need a reason. You're right. It's like the Freedom of Information Act, more so. If I want to walk in, I can walk in. I don't need to ask anybody anything. I still can, Your Honor, respectfully, we disagree on this. I still contend that before you could even think about reversing a case, you would need some evidence that there was members of the public who were excluded. We know that the family member sat through the whole trial, right? They sat through the entire trial. They did not sit through the trial. Well, many of them sat through much of the trial. Through the testimony, providing the testimony. Well, that's true. They didn't sit through the eliminate motions. Well, yes, but we have no reason to think that they would have not come in earlier if they had been allowed in earlier. Respectfully, Your Honor, that's speculation on the Court's part. In any event, the public trial protection does not depend on anybody asking anything. But, Your Honor, excuse me, but the United States Supreme Court has consistently said that the public trial right only comes into play when there's an objection by the defendant. And that's very clear in Waller. It's very clear in Press Enterprise. And that was the rule at the time. I thought in Presley there was no request. Excuse me? I thought there was no objection in Pressley. I'm sorry. In Pressley, was there an objection? Yes, there was. In that case, the uncle wanted to – the defendant wanted his uncle to stay in through four years. So there was an objection in Pressley. And I believe, Your Honor, in this case, remanded Withers for finding that was one of the questions to be found on the remand hearing on Withers was whether the defendant – excuse me – the trial counsel had objected, and if so, whether he had or not, and if there was a reason why he had or not. Of course, in this case, trial – there was no reason for trial counsel to object because the exclusion of the prospective jurors was for the benefit of defendant and solely for the benefit of defendant. There was – That's sort of the – more or less the reasoning of the California Supreme Court on direct appeal, right? Yes. That it was all for the – under Hovey and that practice, it was for the benefit of defendant. So there's no reason why he should have objected. Correct. How do we know, one, well, whether or not that was like the common practice? We don't know that, do we, in that era? In other words, see, I can see if, you know, every defense attorney in a capital case assumed voir dire would be closed and, in fact, maybe would ask for voir dire to be closed because, you know, some of the – at least at that time, before California law was changed, was that it – that kind of voir dire benefited the defendant, right? That was the belief, at least then. Yes, Your Honor. And that was – if you would – and I haven't done it here, but if you would like me to, I can present you with all of the California Supreme capital trials from that era in which voir dire was conducted as directed by Hovey. But wait a minute. But that's not answering the question we're asking. The question isn't whether the jurors were excluded. We know they were. The question was whether it was done outside the courtroom and with a closed courtroom, which we don't know. It was in Press-Enterprise, I can tell you that, which was People v. Albert Greenwood Brown, which has, of course, gone through all levels of review subsequently. But in Press-Enterprise, there was a capital case in Riverside County, which is next to Orange County, and the – it was done in chambers there, and the press was excluded. And the press wanted to get the daily – the transcripts after all the voir dire was done and said that would have been sufficient. And, of course, here, again, the transcripts were never sealed in this case. The transcripts were printed up every day and were always available for review in order to review the proceedings in chambers. And so there was a mechanism – there has always been a mechanism to review what occurred during voir dire to ensure that the rights supporting the public trial were carried out in this case, which is fairness, public integrity, and – You know, just the words that are on the piece of paper, you know, they don't really convey what went on. Respectfully, Your Honor, this Court decides that based on the words on the paper every day, as does every appellate court. I mean, these courts – Yeah, but this is different. That was a trial court. That's where the work is done. That's where the Constitution needs to be protected right at that point. And it wasn't here. Your Honor – It was flouted. Again, respectfully, Your Honor, we contend that there is no evidence that the Constitution was flouted. There was no evidence that anyone who wanted to go in couldn't go in, and that anyone who wanted to review the transcripts – That is a ridiculous argument. No, I think we're past that. You know, I think we obviously have maybe a different perspective on it. But what I'm interested in is getting back to the petitioner's argument of whether or not – or why it was not deficient performance not to object to the closure, right? In other words, I think part of the petitioner's claim is that the failure to object was excused by ineffective assistance of counsel. The question is, why wasn't it excused by a conceitedly terrible lawyer? In the 1970s, there was an actual study done by a professor from, I believe it was Stanford, who looked at – took the prospective – excuse me, people posing as prospective jurors and had some to whom heard – and asked them their questions about the death penalty and whether they would impose the death penalty. And then in a vacuum, without anybody else – The Supreme Court addressed this essential issue in – or argument in press enterprise and said, Assuming that Hobie was the basis of the trial court's order, it's unclear that the interest Hobie sought to protect could have justified respondents' closure order. In Hobie, the California Supreme Court focused on a study that indicated jurors were prejudiced by the answers of other jurors during Foie d'Ivoire. There was no indication of the presence of the public or press affected jurors. The California Supreme Court, in fact, stated that its decision would not in any way affect the open nature of a trial. So even the Supreme Court has rejected your view of what Hobie was about and what the interests were here. Your Honor, respectfully, I just can't get around the fact that there's no evidence that anybody wanted to – that anybody was excluded from the – And I understand that this Court disagrees very strongly, but there was the availability of doing that and there was the availability of reviewing the transcripts every day. Can we talk a little about the procedural questions here? All right. You've – maybe at some point in the past you argued a procedural default, but in your briefs – which I don't know. But in your briefs before us, you did not argue a procedural default as to this issue. Is that right? I didn't make it a separate argument. I do think that I preserved it in the briefs before this Court. And I certainly cited to the cases from this, Wyndham v. Markle, Ballen v. Calderon. And I did say the claim was procedurally barred because Bishotti didn't object to it. So, yes, Your Honor, I did. I understand. Page 60 of the appellee's brief. Okay. And I did cite to this Court, this Court's rulings that have upheld the failure to object, the failure to make a contemporaneous objection as an independent and adequate state procedural rule. That's enforced by this Court on a regular basis. Okay. Let me just find it. Because when I looked, I didn't find it. But you know your briefs better than I do. Go ahead, because I'm not finding it easily, but I will. So page 60 of our brief, you say the claim is procedurally barred is the caption of our subheading. And, again, I say Van Sickle, Wyndham, and Ballen, which are the rulings of this Court that upheld the failure to contemporaneously object as an independent and adequate state procedural bar. Okay. Go ahead with your argument, Your Honor. So, and in any event, the people do contend that, you know, respectively whether the United States Supreme Court, whatever the United States Supreme Court's finding on the issue, at the time in California from 1980 to 1990, it was the prevailing norm of defense counsel to seek closure of the voir dire as to the death penalty phase, the hovey voir dire. That was the prevailing norm of counsel from 1980 to 1990 when the counsel When you say prevailing norm, you mean to close it to everybody, or just exclude the veneer? Your Honor, I think, again, if we look at, although the purpose of hovey was to close it as to perspective, that was the whole question in press enterprises, whether that meant the closure also to other people and to the public. And, of course, we know the result there. And, again, the You were talking about the practice prevalent at the time. That's what I'm asking you. You know, whether the practice was just to exclude prospective jurors or to exclude everybody? Or you can't tell? I could tell you, Your Honor. It's based on personal knowledge. It was, as a practice, it was always done in chambers. Now, that's not in the record, but that's true. I never heard that. That is why the California I never heard that that was a practice to conduct the voir dire in chambers and exclude the public. Your Honor, that I never heard that. That was the easy way to do it as far as you can tell. Your Honor, as far as I know, that's how it was done, and that's why the people of California rebelled in 1990 and passed the People's Initiative to end that process, because it was stretching on for months and months. The people didn't rebel. The people didn't rebel. Well, there's an issue. What's the evidence that people rebelled? The initiative of 1990 that put an end to that practice of the sequestered voir dire. Oh. And that was, again, cited in our brief. Yeah.  So there was a People's Initiative, and I'm not sure who wrote the initiative, but it was passed by initiative to stop the individual voir dire, including in death penalty cases. And I'm sorry I don't have it right at the tip of my fingers, but I did cite it in our papers. But in my experience, that is how it was done. It was done in chambers. I'm sure that if the court would like further briefing, I'd be happy to go back and pull all the capital cases from 1980 on for this court to see to the extent that they discussed whether it was actually in chambers or whether it was in the courtroom with all the prospective jurors kicked out. These cases are really kind of crazy, aren't they? You have an incompetent lawyer, so obvious. He's been disbarred. He doesn't know what he's doing. He's never had one of these capital cases, one like this before. And you've got a judge that's not easy to get along with. And then it goes up, up and down. And, I mean, sure, what happened here was pretty heinous. But we have a Constitution that we have to revere and respect. And that wasn't done here. That wasn't done here. And it's a very easy thing to do. And it wasn't done. Well, with all due respect, Your Honor. You don't have to have respect. I don't care. No. You know, the people can say. Let's go back to this, the closure. And let's assume for purposes of going forward that there was an unconstitutional closure. Okay? I want these young people to know what's going on in this world. You know? Maybe they'll rebel someday, straighten things out. I sure hope they do. So to go back. So we have this strange kind of tension as to whether this is you said you did say in your brief, and I narrated that there was a procedural default. But if the California Supreme Court decided the issue on the merits, then there couldn't have been a procedural default. Right? So did they decide it on the merits? Yes, Your Honor. We contend that they did. And that's at page. So if they decided on the merits, then any procedural defaults are relevant. Right? Correct. No, Your Honor. Well, of course that's true. I mean, they didn't consider it defaulted. But it doesn't matter what you think. Your Honor, they decided on both grounds. They decided on the procedural default and also on the merits. I see. And so where do you think they decided on a procedural default? Page 50, pages 50 to 51 of the People v. Bishotti, which is at 2 Cal 4th 1, pages 50 to 51. They discussed that, and they also said that there was – and they concluded also that there was no impropriety in the jury selection process that warrants reversal. So we contend that this – you know, I'm not sure if they used the actual, you know, specific magic words in their opinion, but I contend that they certainly relied on the failure to object and also that there was – I don't know where the person would have objected, but where they rely on that as a reason not to reach the merits. I mean, they did say that – They reached the merits. They did do both, Your Honor, just as Judge Reel did below. He said that – Judge Reel said on page 19 of his opinion, on that basis, in light of the fact there was no objection to the closure, this Court finds no objectively unreasonable application of federal law that was firmly established at the time. All right. So let's assume now further – I don't know whether that's true or not – that the Court did default. Traditionally, closure – failure or unconstitutional closure in violation of the Sixth Amendment is structural error, right? So how does procedural – so how – and the reason it's structural error is because you can never prove cause – I mean, prejudice. So what are you supposed to do about the prejudice in this instance? Your Honor, respectfully, first, before I touch that, I do contend that the United States Supreme Court does require an objection in order to trigger this violation. I understand that. Okay. I'm treating – I'm asking you – I started where I started for a reason, which is to back that issue up, okay, which I understand to be a federal issue. But as a matter of state default, how can you prove prejudice in a situation like this? You never can, right? Well, you can review the transcripts to see if there were the improprieties that were – that the public trial right protects. But no, I mean, I understand your point, Your Honor, that it's not possible to – going back and redoing it with, you know, when the import year is open would – So what does the case law say then about – if anything, about procedural default in this context? Well, the case law, my understanding, does not have a definitive answer to that, Your Honor, except that if there's no objection, there's no constitutional error. But as to – And the same would be true with regard to Strickland prejudice. You have the same problem, the second time. Correct. Correct. In terms of – So essentially, if we were to decide this issue, we'd have to decide an undecided issue, which is whether or not – whether structural error, there is a separate prejudice inquiry or not. In either instance. In either instance, and also, Your Honor, respectfully, in the context of this being collateral review, 32 years after this young man was murdered and the other man was so horribly maimed. But this is collateral review of a case that has gone to the United States Supreme Court twice and come back. It has gone through review at every – by every court multiple times. And no court has seen this to be a damaging error. And I understand the structural error argument. I also would like to point out that in Arizona v. Fulminante, they relied on Waller for their statement that failure – the violation of a public trial is structural error. And, of course, Waller, they did not require an entire reversal of the case. They required only a – Well, that's different because they required them to reverse what – the part that was closed because you couldn't do that. You couldn't do it here. Correct. And I accept that, Your Honor. I understand that. But I just would continue to say there's very little on the prejudice and what – you know, again, are there any remedies in a collateral matter like this that's 32 years after the fact? Well, why is it 32 years after the fact? Because the job wasn't done correctly by the state court judge to begin with. That's why we have these problems. That's why we have these problems. And, again, Your Honor, these problems that were never, ever raised by – well, Vachonni has raised this as a matter, but, of course, this particular – Well, he had a competent lawyer. I mean, that's his – But he did raise this. This issue has been raised all the way through. As far as I can tell from what I was hearing before, Judge Real should have decided the first go-around but didn't. It doesn't make a lot of sense. Why? That's correct. That's correct, Your Honor. But it was not – well, it has been raised, but it was not pressed firmly by Vachonni until after the 2002 United States Supreme Court ruling. And the people contend that, you know, to be truthful – I mean, excuse me, to look at this really, it really is an abstract claim that truly was raised as an afterthought in this case. But at the time, in 1982, the thought was that a sequester for a DER of the prospective jurors was totally for the benefit of the defendant. Now, that may be true or not true, but that was the thinking at the time in 1982. And that was considered by the California Supreme Court when it ruled in this case and found that there was no error either because of the procedural default  And that has been, again, the people would submit that several of the cases that have gone through review by this court and United States Supreme Court review and have finished all review have had this issue, as People v. Brown, the one that was the basis for the Press Enterprise case. That has gone through this court completely and gone through the United States Supreme Court. And this has never been raised in these collateral matters the way it was here in this late afterthought filing as truly an abstract claim in this case. And the people, unless you have further questions. How many state habeas petitions are filed in the California federal courts every year? How many do you think? Total federal habeas cases. I can tell you that in our office we Out of state trials. In the counties that my office represents, we get about 400 a year in noncapital cases to which we're asked to respond. Now, the trial courts do screen out a lot of cases and don't ask us to respond to all of those cases. But we open about 400 federal habeas cases a year, I would say, Your Honor. And the rest of them are just disposed of by postcards, right? I'm sorry. I was talking about the federal courts. In the state courts, I really have no number of the number of You know, last time I checked in the central district, well, I did this many years ago. There were over 1,000 every year. And then I checked again. I think the figure was up to 2,000 or 3,000. And I'm sure we have more today. So we're getting all these from the state court system. That's correct, Your Honor. And we get very, very few out of our district courts. Very few. Very few. I haven't seen one in a long time. You know what the difference is? The federal judges do a better job when it comes to enforcing the Constitution and saying that its strictures are obeyed. And in the federal system, there's individual responsibility. The case stays with the judge from the minute it's filed until it comes back again 5, 10, 20 years later. So the judge knows he's got the responsibility to deal with it properly because he doesn't want to get it back. It bends over backwards to follow the rules and what's right and what's proper. That's the whole. And, you know, because of the way the state handles these habeas matters, we now have a huge magistrate system, probably more magistrates than there are district judges. And so it's probably good for our business because it gives us lifetime employment because the state isn't doing what it's supposed to do. Then we get it, and then we have to have more people take care of it. You know, you ever look at it that way? Respectfully, Your Honor, I have to say that in my experience, the California state judges who are California attorneys as this bench is do a very good job of it. And in our experience, there's less than 1%, probably less than 1.5% of state cases in which prejudicial federal constitutional error is found. And although we have a very large federal habeas, there's very few errors that are found. And if there's 1,000 habeas filed in the federal court, maybe one petition will be granted or two a year. But nonetheless, we get them. And we have to deal with them. And we have to deal with them primarily because of how they're handled in the state court system. I mean, that's just the way it is. I've been around a long time, and I'm giving you the benefit of my wisdom. Well, I respectfully have a different point of view, Your Honor, but I respect that we differ on that. So if the Court has no further questions, the people would respectfully ask that the ruling below be affirmed and submit the matter. Thank you. Thank you. Thank you. Your Honors, my colleague from the Attorney General's Office suggests that the prevailing norm in California during the 1980s was to close the courtrooms whenever there was Hoby Bourdier and that all defense counsel would want this. And I believe counsel said that was based on informal information and not in the record. And I can just respond by saying, again, informally and not in the record, I'm the head of a unit that has over 75 capital habeas cases challenging California convictions. And I did look at some of the others. It's not a scientific survey, but I looked at six or seven others. And I'm here to tell you it was not the practice to close the courtroom in Hoby Bourdier in all cases. In fact, it's quite the opposite from what we saw. So it's a distinct question, and I know Judge Berzon read from Press Enterprise, and Press Enterprise highlights this point. But it's one thing to say we're going to have sequestered Bourdier where jurors are kept from other jurors because they may be prejudiced from listening to each other talk about that process. It's quite another thing to close it to the courtroom. And it was just simply not the norm in the practice. And the court doesn't see many claims like this, and there's a reason for that. I think the conclusion is because it was not a common practice and it doesn't happen that much. My colleague talks about Albert Brown's case and that that withstood all this review. Well, there's no published opinion adjudicating a public trial claim raised on behalf of Mr. Brown. And I looked at his federal habeas petition. There is no public trial claim in there. You know, cases are not precedent for issues not decided. I don't think Mr. Brown's case — But let's go to the default question. Looking closely at the brief, they did raise the procedural default, although you said they didn't. So what do we do with that? Well, as I said before, I think the court should find it waived based that it wasn't — And why? Based on what? It was not presented when we started off in state court. The time to raise that is in the answer in district court. And they did not raise a procedural bar defense to the public trial claim. They said the claim was denied on the merits. And so the first time they have come back — Only on the merits. Yes. Well, that's why I asked her this time. She did say it was defined on the merits, but not only on the merits. No, understood. I'm just saying what they said in their answer when this case started in district court. And they said it was raised — it was denied solely on the merits, and they did not raise a procedural bar defense at all. And they did on other claims, but not this one. But Judge Reel did this time around, yes. Judge Reel, I think I agree with the depiction counsel made, is he denied it on the merits, although he took into consideration, I think, the failure to object. I don't think he found that as a bar. I think he just made it part of the analysis. Well, he had one issue that he decided in favor of the defendant. And had that succeeded, that would have dealt with the whole case. Correct. So that's why he said moot. In other words, if you win on this, we don't have to deal with these others. The first time around. Correct. There's a real judicial efficiency component to that. Judicial efficiency, yes. Indeed. I'd like to address the Attorney General tries to make the point — I didn't mean to — the Attorney General tries to make the point that, you know, no one was supposedly excluded. And I think — I just want to add to that. You know, it is reasonable to conclude that people were excluded. The record is clear that people were attending this trial throughout the trial, the defendant's family, Mr. Wahlberg. I'll just give the courts a few sites. I don't mean to bore the court, but I'm not sure they're all in our briefs. But, for example, at trial transcript 2799, Mr. Wahlberg says that he has sat through the whole trial. At the penalty trial, where defendant's relatives were presented, at pages 3124, 3141, 3160, 3188, 3201, 3216, and 3238, for all those people, they testified that they had sat through the trial. In the defense — in the prosecutor's guilt phase closing at page 2986 and 87, he says families have been through here throughout the course of the trial. Well, I think what Ms. Beal is referring to is there's nothing in the record that indicates that any one of those people or anybody else came up to the judge or the clerk and says, pardon me, but could I go into the chambers because I'd like to listen to voir dire? And they were told no. There's nothing like that in the record, right? There isn't. But I think Your Honor addressed that when Your Honor asked, well, how are you supposed to get back in the chambers? I mean, have you run the gauntlet to get back in the chambers? And so we don't have that. But I think when you look at the record as a whole, it's unreasonable to conclude that people would not have been seen on this. So let's go back to my favorite subject, which is suppose we thought there was a preserved procedural default claim. Is your — are you ultimately arguing that for purposes of prejudice, either stricter prejudice or Coleman causing prejudice, that when you have structural error, there's no prejudice problem? Is that essentially what you're arguing? I think that is right, Your Honor. And the United States v. Withers case, 638 F. 3rd, 1055 had — It leaves the question open with some sympathy for it. Well, right. And the statement is made there that because it's a structural error, prejudice would be shown even on plain error reviews. So I think it's showing how strong the prejudice is in a case like this. And my understanding is that there's a circuit split on the issue. On some variants of the issue, anyway. Some courts say yes, it's per se, and some people say otherwise. I'm not sure, Your Honor. All right. Unless there are any further questions, I'll just add this. You know, as a lawyer, I guess you want to use all your time. Thirty-five seconds. If the Court, again, were to — I should have done that this morning and got it out of the way. If the Court were to leap over all these things and find there is a procedural bar here, again, we can show cause and prejudice. And if the Court doesn't find that on the current record or remand for an evidentiary hearing on that — Well, you can show cause, but how would you possibly show prejudice? I'm with you, Your Honor. That's why it's a structural error. But the argument is that you have to show prejudice. That's why it's a structural error. Correct. Thank you very much. Thank you. All right. The case is submitted. And the classroom is open for business.
judges: Pregerson, Tashima, Berzon